**WO**                                                                                                           NN

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| American Casualty Company of Reading, Pennsylvania,<br><br>   Plaintiff,<br><br>vs.<br><br>Valerie A. Kemper and John Doe Kemper, wife and husband,<br><br>   Defendants. | No. CIV 07-1149-PHX-EHC<br><br>**ORDER** |

Before the Court are cross motions for summary judgment and partial summary judgment between Plaintiff American Casualty and Defendant Valerie A. Kemper[1] on the issue of insurance policy coverage. (Dkts. 24, 25).

**I. FACTS**[2]

American Casualty Company of Reading, Pennsylvania ("American Casualty") issued a Healthcare Providers Professional Liability Insurance Policy ("Policy") to Kathleen Bynum

---

[1] As a precautionary measure, American Casualty included John Doe Kemper as Kemper's husband in its Complaint. American Casualty noted, however, that Kemper's Maricopa County Superior Court CV 2007–012195 complaint against American Casualty dated July 9, 2007, which case was removed to this Court, indicates Kemper is an unmarried woman. (See Dkt. 24, p. 1, note 1).

[2] For a more detailed account of the stipulated facts, see the parties' *Stipulated Facts and Exhibits for Purposes of Cross-motions for Summary Judgment and Partial Summary Judgment on Issue of Policy Coverage* ("Stipulated Facts") (Dkt. 25, parts 3-6).

("Bynum") (Dkt. 25, pp. 2-4).  The Policy covers her professional services as a clinical/rehabilitation counselor.

Valerie Kemper ("Kemper") owns and operates West Valley Psychological Services. ("WVPS") (Dkt. 24, p. 7). She and Bynum entered into an independent contractor agreement in which Bynum would provide individuals, couples, and family counseling services at WVPS. They entered into a second agreement in which Bynum would provide substance abuse treatment and counseling. (See Stipulated Facts, Exh. 2, p. 2).  Bynum left WVPS before the contracts expired and took approximately 150 patient files with her, as well as other property including cash. (See Stipulated Facts, Exh. 2, p. 2).  Kemper reported this to the police and to the Arizona Board of Behavioral Health Examiners ("ABBHE"). Kemper implicated Bynum in improper billing practices that resulted in health care provider payments made out to Bynum rather than WVPS; defamation of Kemper and her professional practices to health care providers and the ABBHE; the taking of patient files without the patients' consent and in violation of Kemper's policy that all files remain with WVPS; and the establishment of her own counseling service, providing care to WVPS' patients, among other claims. (See Stipulated Facts, Exh. 2).

On November 14, 2003, Kemper sued Bynum in Maricopa County Superior Court, case number CV 2003-021867, for defamation and breach of contract, among other claims.[3] ("underlying action") (Dkt. 25, pp. 4-5). American Casualty provided Bynum a defense under a reservation of rights[4], and on June 29, 2006, informed her that it would not provide indemnity nor participate in any settlement. (Dkt. 25, pp. 5-7, 19-21).  American Casualty indicated it would continue to provide Bynum defense counsel as a courtesy. (Dkt. 25, p. 19).

---

[3] The other claims were: breach of the covenant of good faith and fair dealing; interference with contractual relationships; interference with prospective business advantage; conversion; accounting; intentional infliction of emotional distress; and punitive damages. (Dkt. 24, p. 4).

[4] Reserving the right to later deny coverage for claims not covered by the policy.

- 2 -

On Bynum's motion for partial summary judgment, the Maricopa County Superior Court dismissed Kemper's claims for intentional infliction of emotional distress and punitive damages on June 28, 2005. (Dkt. 24, p. 5). On Kemper's motion for partial summary judgment, the court agreed there were no disputed issues on the breach of contract claim, but denied her motion on the defamation claim on May 5, 2006. (Dkt. 24, p. 5). With the assistance of counsel provided by American Casualty, Bynum entered into a settlement agreement with Kemper in which Bynum agreed to have judgment entered against her for breach of contract and defamation. (Dkt. 25, p. 23). Bynum agreed to pay Kemper $200,000 in damages for the breach of contract. In addition, Kemper agreed to withhold execution on the agreed-upon amount of $750,000 in damages for defamation. As part of the settlement, Bynum assigned Kemper all rights and claims she "has or may have against her insurer American Casualty . . ." (Dkt. 25, p. 23). On March 16, 2007, the underlying state action was dismissed. (Dkt. 25, p. 23).

On June 12, 2007, American Casualty filed a Complaint for Declaratory Judgment against Kemper, CV 07-1149-PHX-EHC (Dkt. 1), asserting there is no coverage under the Policy for the claims Kemper has against Bynum. On July 9, 2007, Kemper filed a breach of contract and breach of duty of good faith and fair dealing lawsuit in Maricopa County Superior Court against American Casualty, which American Casualty removed to federal court. American Casualty's lawsuit for declaratory judgment and Bynum's suit against American Casualty were consolidated on August 27, 2007. (Dkt. 19).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "when there is no genuine issue of material fact" such that "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In determining whether to grant summary judgment, a district court must view the underlying facts and the inferences to be drawn from those facts in the light most favorable to the nonmoving party. See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

If a party bears the burden of proof at trial as to an element essential to its claim, and fails to adduce evidence establishing a genuine issue of material fact with respect to the existence of that element, then summary judgment is appropriate. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Not every factual dispute is capable of defeating a properly supported motion for summary judgment. Rather, the party opposing the motion must show that there is a genuine issue of material fact. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A factual dispute is genuine if the evidence is such that a rational trier of fact could resolve the dispute in favor of the nonmoving party. Anderson, 477 U.S. at 248. A fact is material if determination of the issue might affect the outcome of the case under the governing substantive law. Anderson, 477 U.S. at 248. Thus, a party opposing a motion for summary judgment cannot rest upon bare allegations or denials in the pleadings, but must set forth specific facts demonstrating a genuine issue for trial. See Anderson, 477 U.S. at 250. If the nonmoving party's evidence is merely colorable or not significantly probative, a court may grant summary judgment. See Anderson, 477 U.S. at 249; see also Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, 818 F.2d 1466, 1468 (9th Cir. 1987).

## III. APPLICABLE ARIZONA LAW

Insurance contract provisions are construed "according to their plain and ordinary meaning." Keggi v. Northbrook Prop. and Cas. Ins. Co., 199 Ariz. 43, 46, 13 P.3d 785, 788 (App. 2000). "If a clause may be susceptible to different constructions . . .[the court] will first attempt to discern the meaning of the clause 'by examining the purpose of the exclusion in question, the public policy considerations involved and the transaction as a whole.'" Keggi 199 Ariz. at 46, 13 P.3d at 788 (citations omitted). In that process, an insurance policy must be reasonably and practically construed. See Am. Family Mut. Ins. Co. v. White, 204 Ariz. 500, 504-05, 65 P.3d 449, 453-54 (App.2003) (citing Allstate Ins. Co. v. Powers, 190 Ariz. 432, 435, 949 P.2d 521, 524 (App.1997)).

If the court is unable to discern a provision's meaning, ambiguity will be construed against the insurer. Keggi, 199 Ariz. at 46, 13 P.3d at 788 (citation omitted). Additionally,

- 4 -

"public policy favors protecting the interests of injured victims." <u>White</u>, 204 Ariz. at 505, 65 P.3d at 454 (citing <u>St. Paul Fire & Marine Ins. Co. v. Asbury</u>, 149 Ariz. 565, 567, 720 P.2d 540, 542 (App.1986)). On the other hand, a court should "not invent ambiguity and resolve it to expand coverage." <u>Benevides v. Ariz. Prop. & Cas. Ins. Guar. Fund</u>, 184 Ariz. 610, 613, 911 P.2d 616, 619 (App.1996) (citation omitted).

Lastly, "[w]hen determining the scope of coverage of an insurance policy, a court attempts to determine the insurer's intent." <u>Benevides</u>, 184 Ariz. at 613, 911 P.2d at 619. However, the reasonable expectations doctrine provides that "exclusions that subtract from coverage that a consumer reasonably expects must be agreed to and intended, and not merely imposed on an unwitting consumer." <u>White</u>, 204 Ariz. at 506, 65 P.3d at 455 (citations omitted). The <u>White</u> court held:

> A court may apply the reasonable expectations doctrine when a reasonably intelligent consumer cannot understand the policy language; when an insured does not receive full and adequate notice and the provision is unusual, unexpected, or emasculates apparent coverage; when some activity reasonably attributable to the insurer would create an objective impression of coverage in the mind of a reasonable insured; or when some activity reasonably attributable to the insurer has induced an insured to reasonably believe that coverage exists, although the policy clearly denies such coverage.

<u>Id.</u>

## IV. POLICY COVERAGE

Whether Bynum's alleged conduct leading to her defamation conviction is covered by the Policy turns on the interpretation of the insurance contract which is purely a question of law[5]. See <u>Benevides v. Ariz. Prop. & Cas. Ins. Guar. Fund</u>, 184 Ariz. 610, 613, 911 P.2d 616, 619 (App.1996) (citing <u>Thomas v. Liberty Mut. Ins. Co.</u>, 173 Ariz. 322, 324, 842 P.2d 1335. 1337) (App. 1992)). American Casualty argues that Bynum's conduct is not covered because it was not within the required scope of professional services, and in the alternative, that her acts were intended to cause harm, again excluding Policy coverage. Kemper contends Bynum did not have the requisite malice for the Policy's intentional act exclusion to apply, and that the issue was already litigated, via summary judgment, in the underlying

---

[5]The parties agree that Arizona law controls.

- 5 -

action. Kemper also offers argument regarding American Casualty's alleged breach of contractual duties. The argument is inapposite because the sole issue before the Court, as agreed to by both parties, is the issue of Policy coverage.

### A. Breach of Contractual Duties

Kemper argues that American Casualty breached its contractual duties when it withdrew all offers of settlement and unilaterally decided that Kemper's damages were not covered by the Policy. American Casualty contends this argument is premature because Policy coverage is the sole issue before the Court. The Court agrees. Kemper acknowledges that American Casualty continued to provide Bynum a defense in the underlying action for nearly two years, including assistance with the final settlement agreement. (Dkt. 25, p. 4). Therefore, the duty to defend was not breached. The issues of breach of contract and breach of the duty of good faith and fair dealing necessarily follow the resolution of Policy coverage.

### B. "Professional Services"

American Casualty's primary argument centers on its definition of "professional services." It contends Bynum's conduct was outside the scope of her professional services as a "Clinical/Rehabilitation Counselor," a requirement for coverage. Rather, American Casualty argues that the alleged defamatory acts were "focused on billing practices and procedures, administrative issues, and the business relationship between Kathleen Bynum and her co-worker, Valerie Kemper." (Dkt. 24, p. 2). The Policy indicates that "libel, slander or other disparaging materials" are considered covered personal injuries if "committed in the conduct of [the insured's] professional services." (Dkt. 24, p. 3). "Professional Services" within the Policy are defined as:

> those services for which you [the insured] are licensed, certified, accredited, trained or qualified to perform within the scope of practice recognized by the regulatory agency responsible for maintaining the standards of the profession(s) shown on the certificate of insurance and which you perform as, or on behalf of, the named insured. Professional services also means your services while acting in the profession(s) shown on the certificate of insurance as a member of a formal accreditation, standards review, or similar professional board or committee, including the directives of such board or committee.

(Stipulated Facts ¶ 4).

American Casualty argues that the following Stipulated Facts in this case support its position that Bynum's actions were not within the scope of her professional services as a clinical rehabilitation counselor:

1. When Bynum was being investigated, she reported to the Arizona Board of Behavioral Health Examiners ("ABBHE") that Kemper "doctored" her business policies and procedures manual. (Dkt. 25, Exh. 6-7).

2. When United Behavioral Health ("UBH") and Cigna cancelled Bynum's provider status, she responded to them by alleging that Kemper, unhappy that Bynum left WVPS, "manipulated events" which led to the health care providers' decisions to rescind Bynum's provider status contracts. (Dkt. 25, Exh. 15-16).

3. Bynum also told UBH and Cigna that Kemper "fabricated" the audit she performed for the ABBHE and that Kemper's clients were uncomfortable with Kemper's possession of their confidential client records. (Dkt. 25, Exh. 17-18). In a subsequent letter of apology to Kemper, Bynum explained that she was simply trying to preserve her provider status with the health care providers when she made the statements. (Dkt. 25, Exh. 31).

4. Bynum wrote to a third health care provider, Contact[6], describing WVPS' "hostile work environment." She conveyed to Contact her version of events that led to Kemper's filing of a complaint with the ABBHE. She explained the ABBHE conducted an investigation and their findings required that she sign a consent agreement[7] or the board would recommend suspension of her license. Her desire to avoid suspension prompted her decision to sign the agreement. (Dkt. 25, Exh. 19).

5. Bynum made disparaging personal statements about Kemper to others. (Dkt. 24, p. 16).

American Casualty argues that to be covered for professional services liability, "the liability must arise out of the special risks inherent in the practice of the profession[.]'" (Dkt. 24, p. 16) (quoting Bank of California, N.A. v. Opie, 663 F.2d 977, 981 (9th Cir. 1981)). And to ascertain what is inherent in the profession requires looking "not to the title or character of the party performing the act, but to the act itself." Opie, 663 F.2d at 981 (quoting Marx v. Hartford Accident & Indem. Co., 183 Neb. 12, 13-14, 157 N.W.2d 871-72 (1968)). In finding policy coverage, the Opie court observed that "the mismanagement of loan proceeds clearly arose out of Opie's performance of its vocation as a mortgage banker . . .

---

[6] The record does not indicate that Contact rescinded Bynum's provider status.

[7] The consent agreement required that Bynum be placed on probation for one year, participate in various courses, select a board-approved supervisor, and pay a penalty. (Dkt. 25, Exh. 19).

- 7 -

[and t]o conclude otherwise would ignore the nature of the mortgage-banking business, the plain meaning of the policy, and the reasonable expectations of the insured." Opie, 663 F.2d at 982.

In contrast, a medical records processing business that provided copies of records was not rendering professional services when it overcharged for its copies. Medical Records Associates, Inc. v. American Empire Surplus Lines Insurance Co., 142 F.3d 512, 515-17 (1st Cir. 1998), (billing not professional service but merely ministerial or ordinary task). Along the same lines, a "Physicians, Surgeons & Dentists Professional Liability" insurance policy did not cover an insured's wrongful termination and slander lawsuit. Inglewood Radiology Med. Group, Inc. v. Hosp. Shared Serv., Inc., 217 Cal.App.3d 1366, 266 Cal.Rptr. 501 (1989) (medical group's termination of employee not committed in "rendering" of professional services).

American Casualty cites two Arizona cases to support its position: St. Paul Fire & Marine Ins. Co. v. Asbury, 149 Ariz. 565, 720 P.2d 540 (App. 1986); and General Accident Insurance Co. v. Namesnik, 790 F.2d 1397 (9th Cir. 1986). American Casualty contends the Asbury court "cited with approval" the Marx case, the case on which the Opie court relied. (Dkt. 24, p.13). This contention is questionable. Asbury did cite Marx, but without expressly rejecting or adopting it. See Asbury, 149 Ariz. at 566, 720 P.2d at 541 (summing up the Marx rule as "the question of professional liability coverage turn[ing] upon the nature of the tortious act, and not upon the mere circumstance that the tortfeasor is a doctor"). Indeed, the court arguably rejected the Marx rule; the insurer urged the adoption of Marx, but the court ruled in favor of the insured, finding that Asbury, a gynecologist who inappropriately manipulated patients' genitalia during examinations, was rendering professional services and therefore was covered by the policy. cf. Marx, 183 Neb. at 14, 157 N.W.2d at 872 ("A 'professional' act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual").

On the other hand, it could be argued that Asbury followed Opie and Marx, because the sexual misconduct is a special risk inherent in the field of gynecology. Asbury committed his tortious conduct while providing professional services, because the act was "intertwined with and inseparable from the services provided." Asbury, 149 Ariz. at 567, 720 P.2d at 542. The Asbury court distinguished this from a case in which a doctor's sexual molestation of a patient, while being treated for hand injuries, did not constitute professional services; the sexual molestation was not "intertwined with and inseparable from" the treatment of hand injuries, and therefore was not covered. Asbury, 149 Ariz. at 567, 720 P.2d at 542 (citation omitted). It is a fine distinction, but, in any event, the Asbury ruling is an expansive interpretation of "professional services," and unlikely to be characterized as following Marx. See R.W. v. Schrein, 264 Neb. 818, 830, 652 N.W.2d 574, 584 (2002) (rejecting the "minority rule" of Asbury in favor of the "majority rule" in Marx).

In the second Arizona case cited by American Casualty, a malpractice insurer refused to defend a tax attorney in a legal malpractice action. The court found that the attorney, who had solicited his clients to invest in his corporations and partnerships that eventually resulted in significant losses, was acting as a business agent rather than a lawyer. Because he was not rendering legal professional services, the malpractice policy did not cover the malpractice action filed by his clients. General Accident Insurance Co. v. Namesnik, 790 F.2d 1397 (9th Cir. 1986). See also Potomac Ins. Co. V. McIntosh, 167 Ariz. 30, 804 P.2d 759 (App. 1990). Namesnik is distinguishable from the instant case because the insured was acting in a different professional capacity, as an investment agent. Bynum, in contrast, did not take on a different professional role.

With no Arizona cases addressing similar insurance coverage issues for defamation claims, the Court looks to other jurisdictions. In Geddes v. Tri-State Insurance Co., 264 Cal.App.2d 181 (1968), the court found coverage even though the insured psychiatrist was not rendering services to a patient, but rather, was consulted by another psychiatrist, who was looking for a placement for his patient. The second psychiatrist had called the insured regarding the adequacy of a particular hospital, and the operator of the hospital later sued the

insured for slander. The policy language defined "professional services" as any services "*rendered* by [insured] in his practice of psychiatry . . ." Geddes, 264 Cal.App.2d at 182. (emphasis added). The court rejected the insurer's arguments that the policy's coverage was limited to psychiatric treatment or that the policy only covered a suit for slander between the insured and his patients. Instead, the court accepted expert testimony that the consultation was a professional service, even if no fee was charged. Geddes, 264 Cal.App.2d at 183-85.

The Policy in the instant case covers services for which the insured is "licensed, certified, accredited, trained or qualified to perform within the scope of practice recognized by the regulatory agency responsible for maintaining the standards of the profession(s)." The ABBHE is the regulatory agency in this circumstance and it may arguably be inferred that the scope of practice includes the professional standards with which the ABBHE must ensure compliance, especially in light of the second part of the definition that appears to expand coverage beyond that just stated: "Professional services *also* means your services while acting in the profession(s) shown on the certificate of insurance as a member of a formal accreditation, standards review, or similar professional board or committee, including the directives of such board or committee."(Stipulated Facts ¶ 4) (emphasis added).

The Policy does not limit its definition of professional services to services "rendered," nor does it limit coverage to misconduct between Bynum and her patients. Nor is there any indication that Bynum reasonably expected the Policy to so limit the coverage. It appears to cover actions as a member of a board or committee, but whether she must be a committee or board member to be covered for conduct while complying with any board directives, as the last clause indicates, is not clear. In other words, the language is ambiguous. As already noted, ambiguity is construed against the insurer as the drafter of the contract: "[I]f an insurer desires to limit its liability, it should use language that 'clearly and distinctly communicates the nature of the limitation.'" Am. Family Mut. Ins. Co. v. White, 204 Ariz. 500, 506, 65 P.3d 449, 455 (App.2003) (quoting Sparks v. Republic Nat'l Life Ins. Co., 132 Ariz. 529, 535, 647 P.2d 1127, 1133 (1982)).

As a clinical rehabilitation counselor, Bynum was governed by the ABBHE, which eventually investigated Bynum as a result of Kemper's complaints. Bynum and Kemper apparently accused each other of various wrongdoings with regard to their patients, maintenance of patient files, and even to whom the patients belonged, whether they were considered clinic patients or Bynum's patients, when she left the clinic to start her own practice, taking patient files with her. Bynum allegedly defamed Kemper when she attempted to preserve her provider status with various health care providers, and later, to preserve her license to practice at all, when the ABBHE threatened to rescind the license if Bynum did not comply with its directives. These alleged acts cannot be characterized as merely routine or ministerial. Nor can they be described as part of Bynum's work in a different professional capacity. The alleged defamatory acts are in fact intertwined with her professional services as a counselor.

Kemper contends the Arizona courts distinguish between professional liability policies and other types of policies that exclude coverage for professional services; those covering professional services are interpreted broadly, and those with professional service exclusions are interpreted narrowly[8]. (See Dkt. 26, pp. 5-7). The result always favors the insured. The Court need not make such a finding except to emphasize that Arizona public policy favors protecting the interests of injured victims[9].

---

[8] California appears to be one state that follows this rule: one court observed that even if the insurer offers a reasonable interpretation of an ambiguous *exclusionary* clause, the fact that the insured offers *any* other reasonable interpretation means it will be construed in favor of the insured. In other words, the definition of "professional services" is construed narrowly in exclusionary clauses, thus broadening the scope of covered conduct. PMI Mortgage Ins. Co. v. Am. Int'l Specialty Lines Ins. Co., 398 F.3d 761, 765, n. 5 (9th Cir. 2005) (citing Mackinnon v. Truck Ins. Exch., 31 Cal.4th 635, 3 Cal.Rptr.3d 228, 73 P.3d 1205 (2003)).

[9] The same holds true in other states. For example, the Opie court observed that the state's "inclusionary clauses in insurance contracts are liberally construed in Washington in favor of covering all acts fairly embraced by the specified terms." 663 F.2d at 982;

### C. Subjective Intent Exclusion

Kemper contends that American Casualty is bound, under the doctrine of collateral estoppel, by the facts determined on summary judgment in the underlying action. (Dkt. 25, p. 16). Kemper argues the issue of subjective intent was already litigated in Bynum's favor, given the dismissal of Kemper's claims of intentional infliction of emotional distress and punitive damages. As American Casualty points out, however, a conflict of interest suspends the operation of collateral estoppel. Manzanita Park, Inc. v. Ins. Co. of N. Am., 857 F.2d 549, 554 (9th Cir.1988) (where "there is a conflict of interest between an insured and his insurer, the parties will not be estopped from litigating in a subsequent proceeding those issues as to which there was a conflict of interest."). In the underlying action, American Casualty provided Bynum with counsel, who was confronted with adverse interests regarding the issue of intent. Although in Bynum's best interest, establishing that she did not possess the intent to harm Kemper would require that American Casualty provide indemnity; a finding that she did possess the requisite intent would release American Casualty from indemnifying Bynum. The attorney's loyalty was divided. Because a conflict of interest existed in the underlying action, collateral estoppel does not operate.

American Casualty's argument, however, also fails. It contends Bynum acted with the intent to harm, a Policy exclusion foreclosing indemnity. The Policy states that any "injury or damage [the insured] expected or intended, or which a reasonable person would have expected[]" is precluded from coverage. (Stipulated Facts ¶ 4). American Casualty relies solely on the complaint filed in the underlying action as evidence of Bynum's subjective intent to harm Kemper. (See Dkt. 24, pp. 16-17). Analysis of insurance claim coverage is not limited to the complaint. See Urich v. State Farm Fire & Cas. Co., 109 Cal.App.4th 598, 611 (2003) (pleaded allegations with extrinsic facts define insurer's coverage duties, not label chosen by pleader); cf. Kepner v. W. Fire Ins. Co., 109 Ariz. 329, 509 P.2d 222 (1973) (no absolute duty to defend when alleged facts in complaint bring claim within policy coverage, but other facts not reflected therein "plainly take the case outside the policy coverage").

In Arizona, a two-pronged inquiry determines an insured's intent: 1) whether the insured subjectively desired to cause harm; and 2) whether the nature and circumstances of the intentional act were such that harm was substantially certain to result, in which case intent may be inferred as a matter of law. Ohio Cas. Ins. Co. v. Henderson, 189 Ariz. 184, 190, 939 P.2d 1337, 1343 (1997). Generally, cases involving the second prong are extreme acts. See e.g., Love v. Hartford Cas. Ins. Co., No. CV 06-2154-PHX-EHC, 2007 WL 2807598 (D. Ariz. Sept. 25, 2007) (unprovoked punch to face causing broken jaw such that substantially certain to cause injury; intent inferred); Henderson, 189 Ariz. at 191-92, 939 P.2d at 1344-45 (armed robbery resulted in felony murder; intent inferred). Cont'l Ins. Co. v. McDaniel, 160 Ariz. 183, 772 P.2d 6 (App. 1989) (assault and battery, sexual harassment; intent inferred).

"Determining an insured's subjective intent to injure is ordinarily a question of fact." Love, 2007 WL 2807598, at *5 (citation omitted). Although the parties relied solely on stipulated facts, the interpretations of those facts vary and can arguably be resolved in favor of either party. Whether Bynum acted with the subjective intent to defame Kemper is a genuine issue of material fact that precludes summary judgment.

V. CONCLUSION

Kemper's argument addressing alleged breach of contractual duties is not applicable; it is not an issue before the Court. In addition, the Court finds that Bynum's alleged defamatory acts fall within the ambit of "professional services" as defined by the Policy, and is covered conduct. Lastly, whether Bynum's actions fall within the Policy's intentional act exclusion is a genuine issue of material fact that precludes summary judgment.

Accordingly,

**IT IS ORDERED** that Plaintiff's motion for summary judgment (Dkt. 24) is **denied.**

**IT IS FURTHER ORDERED** that Defendant's motion for summary judgment (Dkt. 25) is **denied.**

DATED this 15th day of July, 2008.

*Earl H. Carroll*
Earl H. Carroll
United States District Judge

- 13 -